IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS A. JAUREQUE,<br><br>    Plaintiff,<br><br>  v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,[1]<br><br>    Defendant.<br>_____ / | No. C 11-06358 CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT IN PART AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS** |

This case concerns the Social Security Administration's determination that Plaintiff Carlos Jaureque is no longer disabled and thus no longer entitled to disability benefits. An Administrative Law Judge ("ALJ") affirmed the determination that Jaureque's disability has ended. Jaureque asks this Court to review the decision, and pursuant to Local Rule 16-5, both parties have moved for summary judgment. The Court grants partial summary judgment for the Commissioner and affirms the ALJ's determination that Jaureque has no more than mild social and behavioral limitations. However, the ALJ's determination that Jaureque is not limited by fatigue lacks substantial evidence, and the Court remands the case for further clarification or development of the record as to that issue.

---

[1] Carolyn Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is therefore substituted for Michael Astrue as the Defendant in this action. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d). This Order refers to Colvin as the "Commissioner."

## I.   BACKGROUND

Jaureque suffered spinal fractures, head trauma, and other injuries after falling several stories from a window in 1988, soon after being diagnosed as HIV positive. Administrative Record ("AR") (dkt. 16) at 162, 245. The Social Security Administration ("SSA") found him to be disabled that year, and determined in 1993 and 1997 that his disability continued. Id. at 19. Jaureque's most recent favorable determination of disability, in 1997, found that he "had the following medically determinable impairments: history of head trauma, depression, borderline intellectual functioning, HIV and polysubstance abuse," meeting the criteria for a recognized impairment.[2] Id. at 21. Jaureque received benefits under Title II and Title XVI. See id. at 19. In 2007, the SSA determined that Jaureque was no longer disabled, and Jaureque requested review by an ALJ. Id.

Pursuant to federal regulations, the ALJ followed an eight-step process to review termination of disability under Title II and a nearly identical seven-step process for Title XVI. Id. (citing 20 C.F.R. §§ 404.1594, 416.994).[3]

First, the ALJ determined that Jaureque had not engaged in substantial gainful activity. Id. at 21 (¶ 3). Second, the ALJ determined that, since June 1, 2007, Jaureque did not have "an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in [the Listing of Impairments]." Id. (¶ 5). Third, the ALJ determined that medical improvement had occurred, and fourth, that this improvement was related to Jaureque's ability to work. Id. at 22 (¶ 6). Based on this conclusion, the ALJ

---

[2] The SSA's Listing of Impairments is published as Appendix 1 to 20 C.F.R. Part 404, Subpart P. In 1997, the SSA determined that Jaureque qualified for section 11.18, which was then titled "Late Effects of Injuries to the Nervous System." AR at 21.

[3] The eight steps for termination of Title II disability are as follows: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a listed impairment or an impairment medically equivalent thereto; (3) whether there has been medical improvement; (4) whether any such improvement is related to the claimant's ability to work; (5) if there has been no relevant improvement, whether other specific exceptions apply; (6) if there has been relevant improvement, whether the claimant's remaining impairments are "severe"; (7) what level of "residual functional capacity" the claimant has and whether that is sufficient to perform the claimant's pre-disability work; and (8) whether the claimant is capable of performing other work. 20 C.F.R. § 404.1594(f). The inquiry under Title XVI omits the first step—whether the claimant is engaged in gainful activity—but is otherwise substantively identical. 20 C.F.R. § 416.994(b)(5). For simplicity, this Order uses the Title II numbering scheme.

1  proceeded to the sixth step,[4] where he determined that despite the improvement, Jaureque's
2  impairments remained severe, id. at 23 (¶ 8).  However, in steps seven and eight the ALJ
3  determined that Jaureque retained residual functional capacity to perform medium work,[5] and
4  that a significant number of jobs exist in the national economy that Jaureque would be
5  medically qualified for.  Id. at 23, 26 (¶¶ 9, 14).  The ALJ therefore concluded that
6  Jaureque's disability had ended.  Id. at 26.

7        This case focuses on steps two, seven, and eight: whether Jaureque has a listed
8  impairment or other impairment equivalent thereto, the extent of Jaureque's residual
9  functional capacity, and whether work exists that Jaureque can perform.

### A. Determination of No Listed Impairment

11        The ALJ based his conclusion that Jaureque did not have a listed impairment on the
12  following determinations.  First, although Jaureque has HIV and had a low CD4 lymphocyte
13  count in 2008, that alone does not indicate the presence of an opportunistic infection, and
14  Jaureque's HIV was otherwise asymptomatic.  Id. at 21-22.  The ALJ noted that Jaureque
15  had experienced "rash/scabies," but this condition resolved with medication.  Id. at 22.
16  Although Jaureque had received treatment for hepatitis C, the virus was not detectable as of
17  2005.  Id.  Jaureque's documented spinal damage[6] and reported back pain did not include
18  evidence of nerve root damage, and Jaureque's reported activities indicated that his back
19  problems did not cause any significant limitation.  Id.  The ALJ acknowledged Jaureque's
20  diagnosis of hypogonadism and that Jaureque "repeatedly reported fatigue," but found
21  Jaureque's fatigue to be "subjective and dubious because he wanted growth hormone,
22  steroids and testosterone shots in order to 'get big.'"  Id. (citing a medical report, id. at 333).

---

[4] The ALJ properly bypassed the fifth step, which only applies when there has been no medical improvement relevant to the claimant's ability to work.  See AR at 20; 20 C.F.R. §§ 404.1594(f)(5), 416.994(b)(5)(iv).

[5] The ALJ determined that Jaureque had no past work experience to compare to his residual capacity in step seven.  AR at 25.

[6] "[T]he June 2008 x-ray study of the lumbar spine revealed the following: a nonacute compression deformity at L4 with disc narrowing at L3-L5 and facet sclerosis; bilateral facet sclerosis at L5-S1; and degenerative change in the costotransverse joint at T10."  AR at 22 (citing AR at 449).

3

### B.   Determination of Residual Functional Capacity

In determining Jaureque's residual functional capacity, the ALJ found that Jaureque's statements as to the "intensity, persistence and limiting effects" of his symptoms were not credible. Id. at 23. Jaureque exhibited "poor compliance" with treatment regimens, but remained asymptomatic from his HIV despite ceasing HIV medication from 1996 to 2008. Id. Medical reports from Jaureque's treating physicians indicate that Jaureque was given testosterone shots to treat fatigue, which was initially attributed to hypogonadism and later to HIV. AR at 333-48, 450-72. However, the ALJ determined that Jaureque's fatigue claims were not credible because Jaureque's daily routine included weightlifting and completing household chores without assistance, and because treating records indicate that Jaureque told his doctor that he wanted the testosterone shots in order to enhance the results of his bodybuilding. Id. at 24-25. The ALJ credited "testi[mony] that [Jaureque's] subjective complaints of fatigue are not related to HIV" from Dr. Michael Bloom, a physician who did not examine Jaureque but appeared as an impartial medical expert. Id. at 24-25. The ALJ also noted Jaureque's history of substance abuse leading to arrests and involvement with the criminal justice system. Id. at 24.

The ALJ relied on a report by Dr. Michael Venard, Ph.D., a clinical psychiatrist who examined Jaureque, as well as on Jaureque's behavior at hearings before an SSA officer and the ALJ, to determine that Jaureque did not have cognitive or social impairments that would significantly affect his ability to work. Id. at 22-25.

### C.   Determination of Ability to Perform Jobs in the National Economy

The ALJ determined that Jaureque had limitations on his ability to do "medium" work. Id. at 26. The ALJ therefore asked a vocational expert whether jobs exist for a person with mild limitations affecting concentration, pace, persistence, and social interaction, and math skills at a third grade level, and relied on the expert's testimony that such a person could work as a cleaner of buildings or vehicles, positions with large numbers of jobs in the national and California economies. Id. at 26, 650-52.

4

The ALJ also asked the vocational expert, in the alternative, about jobs with a "light level of exertion," and the expert discussed jobs for graders, sorters, and production laborers. Id. at 652-53. The expert testified that jobs would probably not be available for someone with these limitations who "showed a consistent pattern of missing [work] two or three times each month," id. at 653 (responding to a third hypothetical from the ALJ), or for someone who "needed to take frequent breaks because of fatigue," id. at 656-57 (responding to a question from Jaureque's attorney).

The ALJ determined that Jaureque's impairment ended on June 1, 2007. Id. at 26. The SSA Appeals Council denied review, thus making the ALJ's decision the final decision of the Commissioner.[7] Id. at 6. Jaureque seeks review by this Court, and moves for summary judgment on the ground that the ALJ did not properly evaluate Jaureque's testimony and the opinions of treating physicians. Pl.'s Mot. (dkt. 18) at 3. The Commissioner opposes Jaureque's Motion and also moves for summary judgment. Comm'r's Mot. (dkt. 21).

## II.    LEGAL STANDARD

A district court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The record as a whole, including the evidence that supports and the evidence that detracts from the Commissioner's conclusion, must be considered. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

---

[7] The record indicates that before denying review on October 28, 2011, the Appeals Council initially vacated and remanded the ALJ's decision on August 18, 2011 due to an inability to locate the recording of the hearing. AR at 6, 11-12. However, neither party challenges the validity of the ALJ's decision on that basis, and the record includes a transcript of the hearing. Id. at 600-58.

5

The court may not affirm the Commissioner's decision "simply by isolating a specific quantum of supporting evidence." Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989) (citing Jones, 760 F.2d at 995). However, if substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, and may be set aside only if an improper legal standard was applied in weighing the evidence. See Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002); see also Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

Summary judgment is a method for disposing of an action in which there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The burden of establishing the lack of a genuine issue of material fact is on the moving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A fact is "material" if it could affect the outcome of the case. See id. at 248. All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). "The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

### III.   DISCUSSION

Jaureque argues that the ALJ's decision should be reversed because it contradicts Jaureque's treating physicians' diagnoses of disabling impairments, including HIV-related fatigue. The ALJ acted within his authority in giving little weight to Jaureque's testimony and to the reports of Dr. Kubota and Dr. Pendleton, and relied on substantial evidence in

6

determining that Jaureque's social and behavioral limitations are no more than mild. However, the ALJ cited no substantial evidence contradicting the physicians' reports of fatigue, and should clarify his opinion or supplement the record as to that issue.

### A. Substantial Evidence Supports the Determination of No Social or Behavioral Impairment

The ALJ permissibly discounted Dr. Kubota's conclusory opinion as to Jaureque's social and behavioral impairments and credited Dr. Venard's contrary opinion that any such limitations were mild. Jaureque's argument that Dr. Kubota's opinions support a finding of disability under Listing 12.02 therefore fails. See Pl.'s Mot. at 4-5; Listing of Impairments § 12.02 (organic mental disorders).

"When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). Although generally "[g]reater weight must be given to the opinion of treating physicians, . . . an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings." Id. (citations omitted). The ALJ may also credit a non-treating physician over a treating physician if the ALJ "give[s] specific, legitimate reasons" for doing so. Id. (citations omitted).

The record in this case includes conflicting evidence as to Jaureque's behavioral limitations. The ALJ granted substantial weight to the opinion of Dr. Venard, who examined Jaureque, administered psychological tests, and determined that Jaureque exhibited average intelligence and only mild impairment in processing speed, social judgment, and ability to interact appropriately with others. AR at 248. According to Dr. Venard, Jaureque "is able to understand, remember and carry out simple instructions in a typical work setting," "is not significantly limited in his ability to respond appropriately to supervisors [or] to changes in a routine work setting," demonstrated "no emotional or psychological deficit," and "does not appear limited in his ability to respond appropriately to usual work situations." Id. In contrast, Jaureque's treating physician Dr. Kubota checked boxes on an evaluation form indicating that Jaureque had "[m]arked restriction of activities of daily living," "[m]arked

7

difficulties in maintaining social functioning," and "[m]arked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." Id. at 371 (emphasis omitted). Dr. Kubota also noted "coping skills" and "impulsiveness" as manifestations of Jaureque's HIV. Id.

The ALJ gave Dr. Kubota's opinion "little weight" because, among other reasons,[8] it was "not corroborated by objective evidence or . . . treatment notes." Id. at 25. This determination falls within the ALJ's authority to discredit a physician's opinion that is "conclusory, brief, and unsupported by . . . objective medical findings." See Batson, 359 F.3d at 1195; see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) ("When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's that is conclusory and brief and unsupported by clinical findings."). Dr. Kubota's opinion in the record is a three-page form, and his statements as to Jaureque's social and behavioral limitations primarily take the form of checkboxes. AR at 369-71; see Batson, 359 F.3d at 1195 (noting that the discredited treating physician's opinion "was in the form of a checklist"). The record does not contain any description of Dr. Kubota's treatment or clinical observations of Jaureque. See AR at 369-71. Dr. Venard provided a more detailed description of his examination and of Jaureque's limitations and abilities. Id. at 244-49. In addition to crediting Dr. Venard's opinion, the ALJ noted that Jaureque's behavior at his hearings was inconsistent with significant social limitations. Id. at 25. The ALJ's determination that Jaureque had only mild social and behavioral limitations was supported by substantial evidence, and the ALJ did not err in giving minimal weight to Dr. Kubota's opinion in light of Dr. Venard's conflicting and better-supported report.

---

[8] One reason that the ALJ stated for giving little weight to Dr. Kubota and Dr. Pendleton is that "their opinions are advocatory in nature." AR at 25. As Jaureque correctly notes, "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995); see Pl.'s Mot. at 6. Nor may an ALJ disregard a treating physician's opinion simply because it addresses the ultimate issue of disability. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). However, the point is moot because the ALJ provided other legitimate reasons to give reduced weight to these opinions. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (citing Batson, 359 F.3d at 1195-97).

8

**B.   No Substantial Evidence Supports the ALJ's Finding Regarding Jaureque's Fatigue**

The issue of Jaureque's fatigue is more complicated, because although the ALJ had valid reasons to give limited weight to Jaureque's testimony and to Dr. Pendleton's opinions, the record does not include any conflicting medical opinions as to the existence or extent of Jaureque's chronic fatigue.

### 1.   The ALJ Permissibly Determined That Jaureque Was Not Credible

The record includes Jaureque's description of his limitations caused by fatigue, including that he "can't stand for long periods of time" and has difficulty completing housework and chores due to fatigue. E.g., AR at 129-21, 643. The ALJ determined that Jaureque's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible." Id. at 23. Among other reasons, the ALJ cited Jaureque's stated desire for testosterone shots and human growth hormone for bodybuilding purposes. Id. at 22, 24; see id. at 333 (Dr. Pendleton's observation that Jaureque "wants G. Hormone/steroids/test[osterone] shot 'to get big'"); id. at 248 ("Also interested in HGH but no wasting.").[9]  When a claimant has a nonmedical motive to exaggerate symptoms in order to obtain drugs, an ALJ may permissibly discredit the claimant as well as physicians' opinions that rely on the claimant's subjective complaints. See Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) ("[T]he ALJ cited the likelihood that unbeknownst to Dr. Christiansen, Edlund was exaggerating his complaints of physical pain in order to receive prescription pain medication to feed his Valium addiction. Accordingly, the ALJ properly concluded that 'the claimaint's complaints are not credible or supported by substantial evidence.'"); see also Alexander v. Comm'r of Soc. Sec., 373 Fed. App'x 741, 743 (9th Cir. 2010) ("The record supports the ALJ's conclusion that Alexander's drug-seeking behavior was evidence of 'a tendency to exaggerate pain.'"). The ALJ also cited Jaureque's "history

---

[9]The Court need not address the ALJ's other reasons for determining that Jaureque was not credible because Jaureque's stated desire to obtain testosterone and other drugs for non-medical reasons is sufficient. Jaureque's statement on an SSA form that he "feel[s] [he is] able to return to work," AR at 84, not mentioned by the ALJ, might also be relevant to a credibility determination, but is likewise unnecessary to consider because of the evidence of drug-seeking behavior.

9

of polysubstance abuse," which supports an inference of drug-seeking behavior. AR at 24; see, e.g., id. at 245, 281; see also Edlund, 253 F.3d at 1157. The ALJ therefore had sufficient evidence to conclude that Jaureque's statements were not credible.

### 2. The ALJ Permissibly Gave Reduced Weight to the Treating Physicians' Opinions Regarding Fatigue

"By rule, the Social Security Administration favors the opinion of a treating physician . . . ." Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). When such an opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. (quoting 20 C.F.R. § 404.1527(c)(2)) (alterations in original). Under Ninth Circuit precedent an ALJ must have "clear and convincing" reasons to disregard a treating physician's opinion that is not contradicted by another doctor.[10] Id. at 632 (citation omitted). As discussed above, however, "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings." Batson, 359 F.3d at 1195. One application of this rule is that an ALJ may discredit a treating physician's opinion that is based on a claimant's subjective complaints if the ALJ has adequately determined that the claimant is not credible. E.g., Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). Even when the treating physician's opinion does not warrant "controlling weight," it "is still entitled to deference," and may still be "entitled to the greatest weight" of the evidence available. Orn, 495 F.3d at 632-33 (citations and internal quotation marks omitted).

The ALJ had valid reasons to give limited weight to the treating physicians' opinions regarding Jaureque's fatigue. Although the record includes a number of treatment records by Dr. Pendleton, all are "conclusory" and "brief" as to Jaureque's fatigue, and none discuss "objective medical findings" supporting a diagnosis of fatigue. See Batson, 359 F.3d at 1195; AR at 333-48, 450-72. Dr. Pendleton also listed "chronic fatigue" on a Sonoma

---

[10] The Court notes the Commissioner's desire to preserve the argument that this standard is not supported by statute or rule, see Comm'r's Mot. at 3 n.1, but this Court is bound by Ninth Circuit precedent.

10

County health services form and checked a box indicating that Jaureque is "disabled and unable to work for one year or more," but as with the treatment records, the form does not discuss any objective diagnosis. AR at 342.

A small number of treatment records refer to a "sleep study" scheduled to occur in the future. E.g., id. at 461 (Progress Note dated Feb. 21, 2008 with notes of "sleep study - 3/21" and "sleep study 3/08"); id. at 462 (Progress Note dated Feb. 7, 2008 with note of "2/20 - sleep study evaluation"). One of Dr. Pendleton's records states that Jaureque "sleeps well" and "awakens easily," but does not clarify whether these conclusions are based on the results of a study or on Jaureque's self-evaluation. Id. at 463. Dr. Pendleton appears to have referred Jaureque to Dr. Vu Tran, a sleep specialist, who identified some wakefulness during the night but discussed daytime fatigue only in terms of Jaureque's subjective statements, without any suggestion of objective confirmation. Id. at 426. A check-box form completed by Dr. Pendleton lists "Increase Fatigue" and "Decrease Energy" as "Chief complaint[s] (as stated by patient)," id. at 360, providing some support for the ALJ's conclusion that Jaureque's fatigue was merely "subjective," see id. at 24-25. However, the form provides no option for the physician to indicate whether a patient's complaint has been confirmed through testing or observation. See id. at 360-62. Most of the records simply do not indicate one way or the other if Jaureque's fatigue is based on subjective complaints or objective diagnosis. See, e.g., id. at 333-48, 450-72. In addition to the treatment records from Dr. Pendleton, Dr. Kubota listed "fatigue" as a manifestation of Jaureque's HIV on the same form discussed above in the context of behavioral limitations, but likewise provided no basis for this diagnosis. Id. at 371.

### 3. The Record Lacks Substantial Evidence That Jaureque Was Not Limited by Fatigue

The Court assumes that the ALJ determined that Jaureque is not limited by fatigue, because the hypothetical questions that the ALJ asked the vocational expert, and relied on in determining that Jaureque was able to perform a significant number of jobs in the national economy, did not include fatigue limitations. See id. at 26 (determining that Jaureque could work as a cleaner and citing the vocational expert's testimony); id. at 650-52 (posing a

11

hypothetical question to the expert with no mention of fatigue); see also Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012) ("The ALJ may meet his burden [to determine whether a claimant is qualified for work] by asking a vocational expert a hypothetical question . . . reflecting all the claimant's limitations, both physical and mental, supported by the record." (emphasis added)).  The ALJ also described Jaureque's fatigue symptoms as "subjective and dubious."  AR at 22.

Because Dr. Pendleton's and Dr. Kubota's records and opinions regarding fatigue are conclusory and lack any indication of objective diagnosis, the ALJ would probably be justified in crediting a contrary diagnosis or other objective evidence if such evidence existed in the record, see Batson, 359 F.3d at 1195, but the record includes no such evidence.  Dr. Bloom, a medical expert who did not examine Jaureque, testified at Jaureque's hearing that Jaureque's fatigue was not related to HIV, but Dr. Bloom did not dispute the existence of the fatigue, nor did he comment on its extent.  See AR at 619 (expressing doubt that Jaureque's fatigue or testosterone treatment were linked to HIV); id. at 626 ("He's had fatigue all these years."); id. at 629 ("[H]e may just have this chronic fatigue syndrome.").

With no contrary medical opinion regarding the existence or extent of fatigue, the ALJ determined that Jaureque's "activities flatly contradict his reported disability and the opinions of his treating sources."  Id. at 24 (emphasis added).  A claimant's daily activities may constitute substantial evidence that the claimant is not disabled when the activities are inconsistent with a reported disability.  See, e.g., Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (holding that daily activities requiring basic levels of concentration undermined claims of "significant concentration problems").  However, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest . . . ."  Orn, 495 F.3d at 639 (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  In this case, the ALJ specifically noted Jaureque's "ability to live by himself, lift weights for an hour, meditate, use public transportation, prepare his own meals, perform household chores,

12

1  clean, shop and do laundry," as well as "lift[] 80 pounds on the bench press and 25-30
2  pounds on curls." Id. at 24-25.  Although Jaureque's activities are not so far removed from
3  the requirements of the workplace as the claimant's activities in Orn, see 495 F.3d at 639
4  ("reading, watching television, and coloring in coloring books"), none of the activities cited
5  here by the ALJ are inconsistent with a need to take frequent breaks during physical activity,
6  which the vocational expert testified could preclude Jaureque from finding a job.  See AR at
7  24-25, 656-57.

8       The ALJ's opinion appears to place significant weight on Jaureque's weightlifting, see
9  AR at 24-25, but even the ability to engage in sporadic strenuous activity does not contradict
10 a need to rest after that activity.  See Gardner v. Astrue, No. CV 08-2809, 2009 WL
11 2380080, at *3 (C.D. Cal. July 31, 2009) (holding that a claimant's stated ability to lift 50
12 pounds did not negate disability where the claimant "did not indicate (and there is no
13 evidence in the record about) how often he can lift 50 pounds"); Runkle v. Astrue, No. CV
14 07-571, 2008 WL 4447679, at *2 (C.D. Cal. Sept. 30, 2008) ("Though the ALJ relied on
15 Jaureque's claim that she could perform any chore, he never mentioned Jaureque's further
16 claim that she had to rest for 24 to 48 hours after completing such chores.").  Normal practice
17 in weightlifting involves resting between sets of exercises even for people without abnormal
18 fatigue; thus Jaureque's statement that he lifts weights "for an hour" does not suggest a full
19 hour of uninterrupted physical activity.  See AR at 24.  Even if Jaureque is able to remain
20 continuously active for an hour, the vocational expert testified that taking a break each hour
21 could disqualify Jaureque from the type of employment that he would otherwise be qualified
22 for.  Id. at 656-57.

23      While the ALJ justifiably gave limited weight to Jaureque's and the treating
24 physicians' statements regarding Jaureque's fatigue, the ALJ's contrary determination that
25 Jaureque was not limited by fatigue lacks substantial evidence.

26      **C.     The ALJ Should Supplement the Record to Determine Whether Jaureque is Disabled by Fatigue**
27
28 "In Social Security cases the ALJ has a special duty to fully and fairly develop the
   record," and this "duty to supplement the record is triggered by ambiguous evidence." Webb

13

1 v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citations and internal quotation marks
omitted).  Under SSA regulations, when the evidence is "insufficient or inconsistent," the
latter including evidence that "is ambiguous" or "does not appear to be based on medically
acceptable clinical or laboratory diagnostic techniques," the SSA "may need to take
additional actions" to clarify the record.  20 C.F.R. §§ 404.1520b, 416.920b.  The SSA may
recontact treating physicians, request additional records, arrange for consultative
examinations, or ask the claimant or others for more information.  Id. §§ 404.1520b(c),
416.920(c).

The evidence cited by the ALJ in this case is ambiguous and insufficient because it is
not clear whether Jaureque's treating physicians based their descriptions of Jaureque's
fatigue on "medically acceptable . . . diagnostic techniques," nor is there substantial
evidence, aside from Jaureque's discredited testimony, as to the extent of the fatigue reported
by his doctors.  If the record contains substantial uncited evidence that Jaureque is not limited
by fatigue, the ALJ should clarify his opinion to identify such evidence.  Otherwise, the ALJ
should "take additional actions" on remand to develop the record as to the issue of fatigue,
see 20 C.F.R. §§ 404.1520b, 416.920b, and if the record ultimately demonstrates any fatigue-
related limitations, the ALJ should obtain evidence from a vocational expert to determine
whether jobs exist for a person with such limitations.  See Hill, 698 F.3d at 1161-62.

## IV.   CONCLUSION

The Commissioner's Motion for Summary Judgment is GRANTED and Jaureque's
Motion is DENIED as to Jaureque's claim of behavioral or social disability, because the ALJ
relied on substantial evidence including Dr. Venard's report.  Jaureque's Motion for
Summary Judgment is GRANTED and the Commissioner's Motion is DENIED as to
Jaureque's claim that the ALJ lacked substantial evidence to determine that Jaureque is not

14

disabled by fatigue. For the foregoing reasons, the Court REVERSES the ALJ's decision in part and REMANDS the case for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: March 19, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE